**BROKERS TITLE COMPANY, INC., and the Title Guarantee Company**

**v.**

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Appellant, and the Title Guarantee Company.**

**No. 79–1438.**

United States Court of Appeals, Third Circuit.

Argued Sept. 4, 1979.
Decided Dec. 6, 1979.

---

**15.** *See* part II *supra*.

**16.** *See* part III *supra*.

Edwin L. Scherlis, Frank, Margolis, Edelstein & Scherlis, Philadelphia, Pa., for appellant.

Reeder R. Fox, Gene E. K. Pratter, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee Title Guarantee Co.

Paul Yermish, Philadelphia, Pa., for appellee Brokers Title Co., Inc.

Before ALDISERT, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

■ The question for decision in this diversity case interpreting Pennsylvania law is whether a professional title insurance broker may avoid the effect of an unambiguous contract clause on the basis of his uncommunicated, subjective misunderstanding of that clause when the other party to the contract had no notice of the misunderstanding and the parties are of relatively equal bargaining power. Because we believe that Pennsylvania would not allow such avoidance, we reverse the district court's determination to the contrary.

### I.

Brokers Title Company is a Pennsylvania corporation engaged in the business of placing title insurance. Between 1969 and 1975 it served as the Philadelphia area agent for Title Guarantee Company, a Maryland corporation. St. Paul Fire and Marine Insurance Company, appellant in this case, is in the general insurance and surety business and had issued to Brokers an "errors and omissions" insurance policy. The present controversy stems from St. Paul's refusal to defend a claim for which Brokers was found legally liable because of its negligence in a real estate closing.

In August 1969, Brokers, representing Title Guarantee, issued a title report on certain real estate in Montgomery County, Pennsylvania. The document was signed by employees from both companies. At the closing, which was conducted in Brokers' office, Brokers received $1,951.40 from the grantors of the property to satisfy outstanding tax liens. Brokers mailed the check for taxes to the City of Philadelphia, however, instead of to Montgomery County. By the time the mistake was discovered the real estate had been sold at a tax sale. The purchasers of the title insurance policy sued Brokers and Title Guarantee in district court for the loss of the real estate. The court determined that Brokers acted negligently in failing to remit the money to the proper taxing authority and that Brokers' negligence was the proximate cause of the purchasers' loss. Judgment was entered against Title Guarantee holding it liable for the negligence of its agent, Brokers, and Brokers was, in turn, held liable to Title Guarantee for the amount of the judgment. Brokers then instituted the present proceedings to recover from St. Paul under the "errors and omissions" policy.[1] The district court rejected St. Paul's defense that the transaction was excluded by a specific clause of the policy, concluding that under the circumstances of this case the exclusionary clause did not apply. *Brokers Title Co. v. St. Paul Fire & Marine Insurance Co.,* 466 F.Supp. 1174 (E.D.Pa.1979). St. Paul has appealed.

### II.

The primary question with which we are confronted is whether St. Paul as insurer is liable under the law of Pennsylvania for Brokers' negligence when it bound itself by the errors and omissions policy to pay "all sums which [Brokers] . . . shall become obligated to pay by reason of the liability . . . caused by any negligent act, error or omission" of Brokers, while at the same time providing in exclusion (G) of the policy that:

THIS POLICY DOES NOT APPLY:

\* \* \* \* \* \*

(G) To claims based upon or arising out of handling or disbursement of funds.

---

1. Brokers' complaint also joined Title Guarantee as a defendant. Subsequently, an order

was entered by the district court realigning Title Guarantee as a plaintiff.

The district court's findings of fact reveal that the policy was sold by a sub-agent of St. Paul, Eugene Murray, to Verne Mockler, the president of Brokers.[2] Murray went to Brokers' office to sell the errors and omissions policy. He read the coverage and the exclusions of the policy to Mockler, and although he read each exclusion aloud, he did not attempt to explain their effect to Mockler because Mockler asked no questions about them. The court also found

> that Mr. Mockler was not aware of the effects of Exclusion G, nor did he understand them. That is, he was not aware that many activities of · his company (those involving handling of funds) were, in St. Paul's opinion, not covered by the errors and omissions insurance policy.

> Mr. Mockler understood the construction of a typical insurance policy. He understood that there is coverage and that there are exclusions from coverage in many and perhaps most policies. However, his experience with the St. Paul errors and omissions policy was his first exposure to such coverage; and, regrettably, he did not understand its terms.

466 F.Supp. at 1176–77.

The district court concluded as a matter of law that exclusion (G) was not ambiguous, and that Brokers as the insured must be considered to have been aware of the language of the exclusion to the same extent as if Mockler had read it himself. *Id.* at 1177. However, the court applied the rule of *Hionis v. Northern Mutual Insurance Co.*, 230 Pa.Super. 511, 327 A.2d 363 (1974), and held that because the effect of exclusion (G) was not explained to Mockler, and because he did not understand its effect, coverage existed under the policy for the judgment against Brokers' negligent handling of the tax funds. 466 F.Supp. at 1179.

Both *Hionis* and *Purdy v. Commercial Union Insurance Co.*, 50 Pa.D. & C.2d 230 (1970), the other case relied on by the district court, involved lay plaintiffs. Conse-

quently appellant argues that because the purchaser in this case, Brokers, was experienced in insurance matters, the *Hionis* rule should not apply. We agree.

### III.

Fundamental principles of contract law are squarely at issue here; choosing, interpreting and applying the appropriate principle cannot be avoided by resort to fact finding. Many sins in the law have at times been swept under a jurisprudential rug in the guise of fact finding, but neither justice nor reason, neither public policy nor logic, compels us to do so here. When questions of law dominate uncontroverted material facts, resort to fact finding from a congeries of irrelevant evidence is unnecessary. Even if such data were to be considered, the fact finder is never permitted to draw inferences that run counter to probable human experience. We believe the trial court erred in the choice of law, in the interpretation of that law, and in its application to the uncontroverted material facts of this case. And were we to reach the point which we do not, we would conclude without difficulty that some of the facts found by the trial court were clearly erroneous.

Our basic disagreement with the district court concerns its attempt to structure a contract ·of adhesion in a relationship between Murray, a sub-agent of St. Paul, and Mockler, a title insurance broker and president of his own firm. Both Murray and Mockler were insurance professionals. Both dealt with insurance policies, one in the business of insuring against negligence, the other in insuring against real estate title defects. Both dealt with policies that contained exclusions or exceptions. Indeed, the documentary evidence in this case indicates that the title report that gave rise to liability, and thereby brought the St. Paul policy into play, consisted of three pages: one page contained a legal description of the real estate, the two remaining pages

---

2. Mr. Murray became ill during the trial and his pretrial deposition was substituted for his testimony. The district court specifically found

Murray's account of the transaction to be credible. *Brokers Title Co. v. St. Paul Fire and Marine Ins. Co.*, 466 F.Supp. at 1176.

consisted of the exceptions (exclusions) that would appear "in the title insurance policy or policies to be issued unless removed." Appendix at 10a–12a.

Mockler testified that his business consisted of his wife and himself, that he would solicit real estate brokers and try to get orders for title insurance, that he would order a title report through a searching company and then close title, recording the various documents, discharging liens, and disbursing funds. In this latter regard he testified that in every settlement, funds had to be handled. It was for this reason that he purchased an errors and omissions policy. He stated:

> The reason I purchased an Errors and Omissions Insurance Policy was to protect myself and my insurance company against any erro[neous] act of myself or my employees in handling of funds at settlement, sending out checks, or failing to record instruments. That was the sole purpose of buying this policy.

App. at 119a.

Although the district court took Mockler at his word, it specifically credited the testimony of Murray that he read aloud to Mockler, presumably word for word, the critical exclusion (G). When Murray read the exclusion to him, Mockler made no statement or inquiry indicating that he did not understand its language.

The uncontradicted testimony was not complicated: Mockler was a professional in "disbursing funds"; he sought an insurance policy that would protect, in his words, "myself or my employees in handling of funds at settlement"; the policy he purchased contained an exclusion *read aloud to him*, 466 F.Supp. at 1176; the exclusionary clause did not apply to "claims based upon or arising out of handling or disbursement of funds"; and, after the clause was read to him, Mockler made no outward manifestation or communication to Murray that he did not understand its terms.

The district court then analyzed these findings. It first declared as a matter of law that exclusion (G) was not ambiguous. The court stated: "Ambiguous is defined by

Webster's Third New English International Dictionary as 'having two or more possible meanings.' By that standard, the exclusion is not ambiguous." *Id.* at 1177. Having so concluded, the court's inquiry could have stopped there under ruling Pennsylvania case law. If, however, it wished to go further, the court could have examined whether this unambiguous clause was brought to the purchaser's attention. It obviously was. And to permit exploration into the outer limits of relevance, it could have allowed testimony on whether there was *any* manifestation by Mockler that he did not understand the terms of the exclusion. The evidence discloses there was none. Absent such evidence, the judicial inquiry should have been brought to a close.

The division of responsibility for contract interpretation under Pennsylvania law is that ambiguous writings will be interpreted by the fact finder, unambiguous writings by the court as a matter of law. *Community College v. Society of the Faculty*, 473 Pa. 576, 592, 375 A.2d 1267, 1275 (1977). When the parties to an agreement reduce their understanding to a writing that uses clear and unambiguous terms, a court should look no further than the writing itself when asked to give effect to that understanding. *In re Estate of Breyer*, 475 Pa. 108, 115, 379 A.2d 1305, 1309 (1977). But the district court went further. Excursing into an assessment of other evidence, the district court proceeded to find as fact that Mockler, the professional fund disburser who desired a policy protecting against mishaps in "handling of funds at settlement," did not understand the clear words of an exclusionary clause unambiguously stating that the policy did not apply to claims "based upon or arising out of handling or disbursement of funds." In the district court's poignant phrase, "regrettably, he did not understand its terms." 466 F.Supp. at 1177.

But we choose not to decide this case by deeming clearly erroneous the court's finding that the professional fund handler did not understand what the words "handling or disbursement of funds" really meant in a

simple thirteen-word exclusionary clause, read to him aloud. We would have no difficulty doing so, even applying the rigid strictures of *Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir. 1972). Rather, we hold that the uncontroverted relevant evidence in this case demands that the rule of *Hionis v. Northern Mutual Insurance Co.*, 230 Pa.Super. 511, 327 A.2d 363 (1974),[3] not be applied. Thus, the subjective impressions of Mockler, uncommunicated to Murray at the time the bargain was struck, simply are not germane to the proper resolution of this dispute.

### IV.

■ The indispensible tool in the operation of a free enterprise society, according to Dean John E. Murray, Jr., is contract. "Traditionally, the essence of contract in such a society lies in volition, that free exercise of will by parties who are on a relatively equal economic footing and who are brought together in the dynamic market place by their needs and desires."[4] Among the restrictions placed on freedom of contract is the prohibition against the so-called contract of adhesion.[5] Under such a contract the parties are not of equal bargaining power and the weaker party, usually the buyer, must adhere to the terms of the form contract if he wants to purchase the goods or services at all. As the concept of adhesion was developed, the courts emphasized the power of the offeror as against the powerlessness of the offeree. *See e. g., Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 135 n.11 (4th Cir. 1967); *Standard Oil of California v. Perkins*, 347 F.2d 379, 383 n.5 (9th Cir. 1965). Adhesion contracts are not the product of bargaining between the parties but are no more than an offer by one party to the other on a "take it or leave it" basis. Contract formation under such circumstances is an experience "not . . . of haggle or cooperative process, but rather of a fly and flypaper."[6] The offeree finds himself virtually compelled by economic necessity to accept a contractual term that he actively opposes, or would actively oppose if he thought opposition not futile.

An adhesion contract has been described as "one which is dictated by a predominant party to cover transactions with many people rather than with an individual, and which resembles an ultimatum or law rather than a mutually negotiated contract."[7]

---

**3.** In *Hionis*, the court held that an ambiguous exclusion in an insurance policy will be construed in favor of the insured and, therefore, affirmed a directed verdict in favor of the insured because the company failed to offer any proof of the insured's awareness of the exclusion. The other Pennsylvania case relied on by the district court, *Purdy v. Commercial Union Insurance Co.*, 50 Pa.D. & C.2d 230 (1970), denied the company's motion for summary judgment, and held that an insurance policy between an "ordinary individual" and an insurance company is a contract of adhesion because the individual has no bargaining power. The court allowed the case to go to trial, placing the burden upon the company to show that the consumer knew of the exclusions at the time of purchase. The court noted that insurance contracts should not be governed by the maxim of *caveat emptor*, but by the same concept of mutuality of assent that governs other contracts. 50 Pa.D. & C.2d at 237.

These cases are no more than examples of the courts' concern that insurance companies should not be allowed to take advantage of their overwhelming bargaining position to thwart the reasonable expectations of a consumer by strategically excluding from coverage that which the consumer apparently purchased. *See also Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346 (1978).

**4.** J. Murray, Murray on Contracts § 350, at 735–36 (1974) [hereinafter Murray].

**5.** Dean Murray reports that the term "contract of adhesion" is usually attributed to Professor Patterson, *The Delivery of a Life Insurance Policy*, 33 Harv.L.Rev. 198, 222 (1919), but that the development of the concept is principally attributable to Professor Ehrenzweig, *Adhesion Contracts in the Conflict of Laws*, 53 Colum.L. Rev. 1072, 1088–89 (1953), and to Professor Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629 (1943). *See* Murray, *supra* note 4, § 350, at 738 n.84.

**6.** Leff, *Contract as Thing*, 19 Am.U.L.Rev. 131, 143 (1970).

**7.** J. Calamari and J. Perillo, Contracts § 9–44, at 341 n.39 (1977) (citing *Siegelman v. Cunard White Star Ltd.*, 221 F.2d 189, 206 (2d Cir.

In the typical contract of adhesion the overborne party does not objectively manifest his assent to the contractual term deemed offensive. The dominant party knows that the other would not accept the term, and thus employs the practices of minute print, unintelligible legalese, or high pressure sales technique. The dominant party realizes that the weaker party's assent is not genuine. Accordingly, the scholar's view, which we readily accept, is that as to the challenged clause or phrase, the essence of assent is absent.[8]

In this case, a sub-agent of St. Paul was dealing with an agent of a relatively large title insurance company, Title Guarantee Company. Nothing in the record indicates that Murray knew or should have known either that Mockler's primary motive for wanting errors and omissions insurance was for fund-handling protection or that Mockler did not agree to or understand the funding exclusion. Conversely, the record does indicate that Mockler was a professional insurance broker, albeit in title insurance rather than in casualty insurance, and that he dealt daily with exclusions in the title reports he processed—including the one that germinated this law suit.

■ The realities of contract negotiations between two parties of relatively equal bargaining position cannot be ignored. There is no evidence that St. Paul would not have issued a policy to Mockler without the exclusionary clause. Had Mockler objected to the clause, and stated so to Murray, an upward adjustment of the premium undoubtedly could have effectuated its deletion. Moreover, we do not find this particular exclusionary clause unfair or oppressive. Essentially, a title insurance broker performs three discrete functions: (1) examining a chain of title, (2) issuing a policy report which summarizes the title search and forms the basis of the policy, and (3) disbursing funds at settlement. An errors and omissions policy that protects only against negligence in functions (1) and (2) serves a reasonable business purpose. We do not find such a contract to be unconscionable, contrary to public policy, or incapable of being freely assented to by the purchaser—the three concepts generally asserted for analyzing a contract as one of adhesion.[9] Instead, we perceive the offer and acceptance to have taken place in a setting that involved two mature businessmen of relatively equal bargaining power. We detect none of the "fly and flypaper" trappings usually associated with a contract of adhesion. We determine that, under the circumstances of this case—considering the fact that both Murray and Mockler are insurance professionals of relatively equal experience, albeit in different insurance specialties, and that after exclusion (G) was read to Mockler he remained mute and did not communicate any indication that he did not understand its terms—Pennsylvania would not hold St. Paul to the level of proof required by *Hionis.*

## V.

■ Once removed from the legal environment of a contract of adhesion, this contract should be interpreted by familiar Pennsylvania contract law principles. A party who seeks to strike down his written obligation must present evidence that is clear, precise and indubitable. *Schoble v. Schoble,* 349 Pa. 408, 411, 37 A.2d 604, 605 (1944). A person of legal age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not in his best

1955) (Frank, J., dissenting)). Another commentator has stated:

> Denying enforcement to a contract on grounds of adhesion thus ordinarily implies judgments with respect to both parties. The party resisting enforcement must have had no reasonable choice but to make the contract, and the party seeking enforcement must have narrowed the choices of the first party by illegitimate means.

Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power,* 84 Harv.L. Rev. 529, 550–51 (1971).

**8.** *See, e. g.,* Murray, *supra* note 4, § 353, at 748.

**9.** *See, e. g.,* J. Calamari and J. Perillo, Contracts § 9–44, at 336–37 (1977).

interest he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument that he signed. *Id.* at 412, 37 A.2d at 605. *See also First National Bank & Trust Co. v. Shaffer,* 338 Pa. 244, 248, 12 A.2d 916, 917 (1940). As Judge Cercone of the Pennsylvania Superior Court has stated:

> The important concept in interpretation of any contract is the objective manifestation of assent. Restatement, 2d § 2, Comment b (1973). The subjective meaning attached by either party to a form of words is not controlling on the scope of the agreement between the parties unless one party knows or has reason to know of a particular meaning attached by the party manifesting assent. Restatement of Contract, Second § 226, Comment b. (Rev.Tent.Draft Nos. 107, 1973).

*Contractor Industries v. Zerr,* 241 Pa.Super. 92, 105, 359 A.2d 803, 809 (1976) (Cercone, J., dissenting). The essence of contract law is the objective intent of the parties and when there has been no allegation of mistake, fraud, overreaching or the like, it is not the function of the court to redraft a contract to be more favorable to a given party than the agreement he chose to enter. *Harris v. Dawson,* 479 Pa. 463, 468, 388 A.2d 748, 750 (1978). When an agreement is read aloud to both parties before its execution and a party testifies that he simply neglected to read the contract before signing, such testimony indicates carelessness and unilateral mistake, not fraud, and the parties will be legally bound by the written agreement. *Kay v. Kay,* 460 Pa. 680, 334 A.2d 585 (1975). "It falls stale upon the ear to be told that a formal contract was not read, or was hurriedly prepared, or ·was signed in haste. Such things are no ground for reforming or invalidating a contract." *Thrasher v. Rothrock,* 377 Pa. 562, 105 A.2d 600, 604 (1954).

Using these precepts to test the circumstances surrounding the errors and omissions contract, we believe that Pennsylvania would hold Mockler to the terms of the unambiguous agreement he signed. Therefore, without the necessity of deeming clearly erroneous the trial court's finding that Mockler did not understand the meaning of the exclusion, and having determined that this issue of fact is relevant in Pennsylvania only when a contract of adhesion is involved and that the contract at issue was not one of adhesion, we conclude that Pennsylvania common law principles of contract interpretation require that the *Hionis* rule not be applied.

Accordingly, we will reverse the judgment of the district court and remand these proceedings with a direction that judgment be entered for the appellant.

GARTH, Circuit Judge, dissenting.

My disagreement with the majority is threefold. First and most important, the majority's holding rests wholly on the unwarranted assertion that Brokers and St. Paul were parties of relatively equal bargaining power. Second, relying on this unsupported premise, the majority then ignores the import of the district court's findings of fact that St. Paul never explained the effect of its insurance exclusion to Mockler, Brokers' president, and that therefore Mockler did not understand it. Third, because these errors flaw the foundation on which the majority's analysis is constructed, the majority has, as a consequence, additionally erred in predicting that Pennsylvania would carve out an exception to the *Hionis* rule in this case.

I.

As I read the record and the relevant case law, I am satisfied that the district court did not err either in its reliance upon the *Hionis* case or in its factfinding in resolving the present controversy. Although admittedly *Hionis* dealt with an ambiguous policy term, as contrasted with the unambiguous exclusion present here, the *Hionis* court stated:

> When a defense is based on an exception or exclusion in a policy, our Supreme Court has held that such a defense is an affirmative one, and the burden is upon the defendant to establish it. *Weissman*

**1182**

*v. Prashker,* 405 Pa. 226, 233, 175 A.2d 63 (1961). *Even where a policy is written in unambiguous terms, the burden of establishing the applicability of an exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him.* See, e.g., *Frisch v. State Farm Fire and Casualty Co.,* 218 Pa. Superior Ct. 211, 275 A.2d 849 (1971); *Purdy v. Commercial Union Insurance Co. of New York,* 50 Pa.D. & C.2d 230, 235 (1970). 230 Pa.Super. at 517, 327 A.2d at 365 (emphasis supplied).

As noted by the majority, the district court found that although Mockler was aware of the exclusion, and the exclusionary language was not ambiguous, St. Paul had failed to explain the exclusion and its effect, and Mockler therefore did not understand its effect. In light of these findings of fact, St. Paul cannot prevail unless either the *Hionis* rule does not apply to this case or the district court's findings of fact are clearly erroneous, *Krasnov v. Dinan,* 465 F.2d 1298, 1302–03 (3d Cir. 1972).

### A.

In a diversity case we are bound to apply Pennsylvania law under the rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Hence our inquiry is to discern or predict the law which would be applied by the Supreme Court of Pennsylvania. In the absence of any decision of that court, declarations of lower state courts are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise," *West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

*Hionis* involved a policy insuring Hionis' leased restaurant against fire. Fire destroyed the contents, improvements, and fixtures of the restaurant. The controversy between Hionis and his insurer centered on the provisions of the policy which reduced or excluded coverage in the event that the improvements were not repaired or re-

placed within a reasonable time after loss. The trial court noted that "if the evidence had clearly demonstrated that the policy limitations and exclusions were the product of the parties' true intentions, the [insurer's] position would have been unassailable," 230 Pa.Super. at 515, 327 A.2d at 365. However, at the conclusion of the plaintiff's case, when the defendant produced no evidence but relied wholly upon the terms of its policy, a directed verdict was granted for the plaintiff. On appeal, the Pennsylvania Superior Court, noting that Hionis' only objective in obtaining insurance was the security of protecting his establishment, and holding that the burden of explaining the limiting insurance provisions and their effect was on the insurer, affirmed the judgment in favor of Hionis.

In so doing, the court stated the considerations for its holding:

Insurance contracts have been viewed under the law as contracts of "adhesion", where the insurer prepares the policy for a purchaser having no bargaining power. Where a dispute arises, such contracts are construed strictly against the insurer. *Eastcoast Equipment Company v. Maryland Casualty Company,* 207 Pa.Super. 383, 218 A.2d 91 (1966). In *East Coast,* we affirmed the decision of a court en banc on the basis of the lower court opinion which provided in part: "The policy behind this rule [construction against the insurer] is sound; the insurer wrote the policy and the individual purchaser is concerned primarily with monetary benefits. Concern with definitional clauses and exclusions is minimal; therefore, if they do become material, they should be strictly construed against the insurer." 38 Pa.D. & C.2d at 511, 218 A.2d at 98.

230 Pa.Super. at 516–17, 327 A.2d at 365.

Thereafter, in *Daburlos v. Commercial Insurance Co.,* 521 F.2d 18 (3d Cir. 1975), this Circuit, in a diversity case, held that *Hionis* represented the law in Pennsylvania. *Daburlos* involved certain exclusions found in Clause 3 of airline insurance policies upon which the insurers relied in refusing payment of the policies when the insureds were

killed. After emphasizing the language of *Hionis* quoted above, Judge Biggs, writing for the court, stated:

Thus, even if we assume Clause 3 was clear and unambiguous in the context of the policy, the defendants had the burden of establishing that the Daburloses were aware of the exclusion presented by that clause and that its effect was explained to them. The defendants did not meet this burden of proof.

*Id.* at 25.

Thus, Pennsylvania, which has had ample opportunity to reject *Hionis,* and our court, which I submit has to date read *Hionis* correctly, have both recognized the full contours of the *Hionis* doctrine and its application even in an unambiguous context.

### B.

Concededly, both *Hionis* and *Daburlos* involved layman plaintiffs. St. Paul, in the first instance, and now the majority, consequently argue that where the plaintiff, Brokers, was "experienced" and "equal in bargaining power" to St. Paul in insurance matters, the *Hionis* rule should not apply. The difficulty with this contention is that the record in this case affords no support for such an argument.

The district court found as a fact that although Mockler understood the construction of a typical insurance policy and that many such policies provided exclusions from coverage, Mockler's "experience with the St. Paul errors and omissions policy was his first exposure to such coverage, and, regrettably, he did not understand its terms," 466 F.Supp. at 1176–77.

The evidence supporting this finding is more than ample. Mockler testified that his business consisted of his wife and himself, Trial Transcript, July 27, 1978, at 92; that he would solicit real estate brokers and try to get orders for title insurance, *id.* at 41; that he would order a title report through a searching company and then close title, recording the various documents, discharging liens, and disbursing funds, *id.* In this latter regard he testified that in every settlement, funds had to be handled,

*id.* at 41–42. It was for this very reason that he purchased an errors and omissions policy. He stated without contradiction:

The reason I purchased an Errors and Omissions Insurance Policy was to protect myself and my insurance company against any error act of myself or my employees in handling of funds at settlement, sending out checks, or failing to record instruments. That was the sole purpose of buying this policy.

*Id.* at 44. He also declared that he had never been familiar with any of the terms of this type of coverage, *id.* at 45, and that St. Paul through Murray had never made any explanation of the policy exclusion to him, Trial Transcript, July 28, 1978, at 21.

This testimony was consistent with Murray's (St. Paul's) testimony on deposition which was credited by the district court, that although Murray had read the exclusions to Mockler, he had *not explained* either the exclusions or their effect. Referring to the exclusions, Murray testified:

Q. With reference to exclusions on page two of the insurance policy, you said in answer to Mr. Scherlis' question: Since that one exclusion [Exclusion G—handling of disbursements] was between A and H you must have read it to Mr. Mockler. Did you read it to Mr. Mockler?

A. Yes.

Q. Did you tell him anything more or say anything more than reading what it appears to be on the piece of paper?

A. I read it. I neither added or deleted.

Murray Deposition at 60.

Hence, even if on an appropriate record the majority arguably might be correct in predicting that Pennsylvania would modify *Hionis* where the insured was equal to St. Paul in bargaining power and where the insured's expertise in general insurance matters was established and found, this is not such a case. The majority can find no support in the record of this case for its bald assertion that Brokers and St. Paul were parties of equal bargaining power or equal expertise. It is thus not surprising that the majority has been unable to cite to

any record evidence which would sustain its assumptions. The record supports only the contrary conclusion.

It is St. Paul which, as the majority acknowledges, is a general insurer whose business consists of creating, drafting, and selling general insurance and surety policies. Mockler and his wife, even though they were in the title insurance business, may appropriately be characterized as no more than a "Mom and Pop" title agency existing at the other end of the insurance spectrum. Mockler testified at trial as to Brokers' business. His testimony and indeed the record as a whole are barren as respects any familiarity which he, Mockler, might have had with the intricacies of insurance beyond the very specific title insurance functions that he performed:

> I would solicit real estate brokers and try to get orders for title insurance. When I got the order for title insurance, I would start processing; and that would be having a title report ordered through a searching company or one of our own people to search the records in order to get the full report against that title. We then would proceed. A settlement would be followed a few months later, and I would handle the recording of the various papers, clearing off the title against any judgments or mortgages or any other liens, and I would disburse funds in order with the settlement sheet itself.

Trial Transcript, July 27, 1978, at 41.

If, in this case, we were sitting as the district court and not as a reviewing court, it is possible that I too might have found, as the majority suggests, that Mockler may have understood the terms of the exclusion. Factfinding, however, is beyond our province, and regardless of the conclusion that might result if *we* had found the facts instead of the district court judge, we are obliged to review factfindings of the district court by an exceedingly narrow standard. *See Chalfant v. Wilmington Institute,* 574 F.2d 739, 747–53 (3d Cir. 1978) (en banc) (Garth, J., dissenting). Accordingly, there being ample evidence in the record supporting the facts found by the district court, no reviewing court in my opinion can hold them to be clearly erroneous, and they must therefore be given effect. As to Brokers, it is therefore apparent that St. Paul's "errors and omissions" policy remained a contract of adhesion, and as such the majority's discussion of hornbook contract law, *see* majority op. part III, is completely beside the point.

*If* indeed Mockler had been the insurance professional which the majority opinion makes him out to be, majority op. p. 1177, and *if* indeed he had been the "mature businessm[a]n of relatively equal bargaining power [to St. Paul]," *id.* at p. 1180, and *if* indeed Brokers had paralleled St. Paul in general insurance expertise and stature, then I too might entertain doubts about applying the adhesion doctrine (an exception to the general rules of contract) to this case. As I have indicated, however, and more importantly, as the record and the district court's findings of fact reveal, Mockler was not an experienced insurance professional in the same context and on the same level of insurance sophistication as St. Paul. The characterizations employed by the majority—that "a sub-agent of St. Paul was dealing with an agent of a relatively large title insurance company, Title Guarantee Company," *id.* at p. 1180 cannot obscure what the record discloses, that in fact *it is St. Paul* which is the large general insurance company and *Brokers* which is a two-employee service agent for a real estate title insurance company.

Thus, there is no occasion to regard the parties here as being relatively equal, any more than one would regard a journeyman mechanic who is knowledgeable about "nuts and bolts" as the equivalent of a skilled technician who services a nuclear power plant. This being so, I find the relevant contract to be one of adhesion—subject, therefore, to the Pennsylvania rule of *Hionis.*

This conclusion is supported by the discussion found in *Purdy v. Commercial Union Insurance Co.,* 50 Pa.D. & C.2d 230, 235 (C.P. Allegheny County 1970):

> We do not intend to treat the individual plaintiff any differently from the large

corporate plaintiff. The burden of proof, in either event, is on the party asserting the exclusion to prove not only its applicability, but its understanding by the party against whom the exclusion is sought. As with any other contract situation, if there is no meeting of the minds on the terms of the contract, there is no contract. If it be shown, in the case of a large corporation, that the insurance contract went along with all the other contracts entered into by the corporation to the corporate attorneys for examination before signing, then it may be reasonably concluded by the court that the exclusion was known to exist and understood as applying to any given situation. However, in the case of an individual construing this contract of adhesion strictly against the insurer, unless it be shown by the insurer that the insured was made aware of this exclusion and its effect on his coverage at the time of purchase of the policy, we will not enforce it as a part of the bargained for agreement.

I am satisfied that the burden placed upon St. Paul by *Hionis* was not met by St. Paul, and that sufficient evidence supported the district court's findings that St. Paul had not explained its policy's exclusionary provision to Mockler. Thus, as the district court found, Mockler did not understand its terms or effect, and Brokers consequently should not be held bound by the exclusionary provision of the policy.[1]

## II.

St. Paul argues that even should the district court be affirmed in its holding that coverage existed under the errors and omissions policy which it had issued to Brokers, the district court nevertheless erred by entering judgment against St. Paul in the

amount of $98,630.40 (order of January 26, 1979). Because the majority has directed that judgment be entered for St. Paul, it did not find it necessary to reach this question. It is for this reason only, that I forgo discussing St. Paul's challenge to the amount of the district court judgment, even though it is clear to me that the district court was correct in its reasoning and result in entering a judgment in the full amount against St. Paul. *See* 466 F.Supp. at 1179–80.

## III.

Because it is evident to me that the district court's findings of fact were not clearly erroneous and that it did not err in its application of the relevant Pennsylvania law, I respectfully dissent from the majority opinion which reverses the district court's judgment. Accordingly, I would affirm the district court's January 26, 1979 judgment against St. Paul in the amount of $98,630.40.

---

1. I do not find it necessary to decide what course would be taken by the Pennsylvania courts in the event that both the insured and the insurer were completely equal in bargaining power. It may be that if the facts found by a district court *on record evidence* established such a case, I too might conclude, as does the majority, that *Hionis* would have little or no impact.

Nor is this case similar to either *Miller v. Prudential Ins. Co. of America*, 239 Pa.Super. 467, 362 A.2d 1017 (1976), or *Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co.*, 583 F.2d 650 (3d Cir. 1978), the cases on which St. Paul relied in its brief. Suffice it to say that even in those cases, which are materially different from the case before us, and which I therefore believe to be inapposite, the *Hionis* doctrine was recognized and acknowledged.