Sandra ZIMMERMAN, Petitioner,

v.

### UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2003.

Decided Nov. 26, 2003.

---

Thomas R. Davies, Lancaster, for petitioner.

Paul R. Jordan, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Sandra Zimmerman (Claimant) petitions for review of an adjudication of the Unemployment Compensation Board of Review (Board) that denied Claimant unemployment benefits. In doing so, the Board affirmed the Referee's determination that Claimant's failure to volunteer that she had signed a non-compete agreement with a previous employer was willful misconduct and, thus, rendered her ineligible to receive unemployment compensation benefits.[1] We reverse the Board.

---

1. Section 402(e) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e), provides,

An employe shall be ineligible for compensation for any week—

\* \* \*

(e) In which his unemployment is due to

In 1998, Claimant began employment at Advanced Health Care in Lancaster, Pennsylvania, where she worked as a scheduling coordinator. Medical Staffing Network (MSN) acquired Advanced Health Care in October of 2000, at which time it required the employees, including Claimant, to sign an "Agreement Regarding Confidential Information, Non–Competition and Non–Solicitation" (Agreement). For consideration of $10 and at-will employment, Claimant signed the Agreement on October 25, 2000, the same day on which it was presented to her. Certified Record at 15 (C.R.——).

The Agreement is a boilerplate document with multiple parts, as suggested in its title. It required Claimant to keep confidential

> MSN's "Confidential Information" [which] includes all information that MSN desires to protect and keep confidential ... or that MSN is obligated to third-parties to keep confidential, including but not limited to "Trade Secrets" to the full extent of the definition of that term under —— law.

C.R. at 15. The Agreement required Claimant to keep these trade secrets confidential unless and until they become public and to keep MSN's "confidential information" confidential for five years after termination of employment and anywhere in the country.

Claimant also agreed to a number of restrictive covenants. For example, she agreed not to induce MSN employees to work for a competitor and not to recruit MSN clients for a period of twelve months after termination of employment without a geographic limitation. The restrictive covenant relevant to this case was the "non-compete" covenant. It provides as follows:

> (c) *Non–Compete.* While I am employed by or in an independent contractor relationship with MSN and for a period of twelve (12) months from the date of termination of my employment or independent contractor relationship with MSN for any reason, I agree that I will not, directly or indirectly, as a principal, agent, contractor, employee, employer, partner, shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity engage in, solicit or perform any work competitive with MSN Business within a sixty (60) mile radius of any MSN office to which I have been principally assigned within the two (2) years prior to termination (the "Restricted Territory"). Notwithstanding the foregoing provisions of this subparagraph, it is understood and agreed that upon termination, I may accept employment or a consulting engagement with a competitive concern within the Restricted Territory whose business is diversified; provided that, prior to such employment or consulting engagement, MSN is given reasonable assurance in writing that I will not, during said twelve (12) month period, render services within the Restricted Territory directly or indirectly to any line of business of such concern that is competitive with MSN Business.

C.R. 17–8. The Agreement further recited that

> [i]n the event that any provision of this paragraph,[2] [any restrictive covenant] is held unreasonable, *a court may modify*

---

his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not such work is "employment" as defined in this act.

**2.** All of the restrictive covenants were set forth in a single, multi-part, multi-page paragraph.

*such provision in any manner* which results in an enforceable restriction.

C.R. 18 (emphasis added). As a coda to the reformation clause, however, Claimant agreed that the restrictive covenants were reasonable and

> will not prevent me from earning a livelihood in my chosen business, that they do not impose an undue hardship on me and that they will not injure the public.

*Id.* Claimant was not given a copy of the Agreement for her own reference or records.

On October 2, 2001, MSN terminated Claimant's employment. It had asked for her resignation, but she refused to resign. However, Claimant was advised that she could report to prospective employers that she had resigned from MSN and that it would give her a good reference.

Shortly, thereafter, Claimant interviewed for a job with Nursefinders of Central Pennsylvania (Employer) located in Harrisburg, Pennsylvania. Employer did not ask Claimant whether she had ever signed a trade secret protection, confidentiality, non-solicitation or non-compete agreement, and Claimant did not volunteer the existence of the Agreement.

Claimant was hired by Employer and, on December 3, 2001, she began training for her new position in Harrisburg. On this first day of work, Claimant was requested to fill out an application, which she did. The application asked, *inter alia,* "Have you ever been discharged or asked to resign from a position?" to which Claimant responded "Yes, MSN already explained." Also on the application, she identified the Regional Supervisor of MSN as a reference.

On December 13, 2001, MSN's law firm sent a letter to Claimant stating that

> you are directed to immediately resign from Nurse Finders and any other company that competes directly or indirectly with MSN and to forward confirmation of your resignation to my attention on or before December 24, 2001.

C.R. 14. It also informed her that MSN was "calculating the amount of damages incurred as a result of your actions and will address that issue once your resignation has been confirmed." The letter asserted that she was not permitted to work for competitors of MSN and claimed that she was soliciting MSN clients.[3]

Claimant promptly informed Employer of MSN's letter and was advised not to "worry about it." Transcript of Testimony 12 (T.T. ——). She gave Employer a copy of the letter, and she contacted MSN for a copy of the Agreement, which she received by fax on December 19, 2002. On that same day, however, Claimant was terminated by Employer for the stated reason that it did not want to get involved in litigation. Employer advised Claimant to retain counsel, which she did, and further informed her that if the problem with MSN was resolved, she could return to work for Employer. C.R. 13.

Claimant then filed for unemployment compensation benefits with the Lancaster UC Service Center (Job Center). The Job Center found that Employer did not prove willful misconduct by Claimant and granted her benefits. Employer appealed the Job Center's decision,[4] and a hearing was

---

3. Claimant vehemently denied this claim. C.R., Claimant Ex. 5. Indeed, the evidence belies the claim because on the day of her discharge she was still being trained. In any case, this claim of MSN was never pursued.

4. However, the Application completed by Employer specifically identified Claimant's reason for separation from employment as "Other" not "Misconduct." C.R. 6.

conducted by a Referee. Neither Claimant nor Employer was represented by counsel at the hearing.

The Referee reversed the Job Center's determination. The Referee found that Claimant was in violation of the Agreement because Employer's Harrisburg office is 41 miles from the MSN office in Lancaster where Claimant had worked, and the Agreement purported to restrict her from employment within 60 miles of Lancaster. The Referee also found that Claimant was dishonest, and her "actions were intentional and deliberate and a disregard of the standards of behavior which the employer has the right to expect." [5] Referee's Opinion at 2.

Claimant then appealed to the Board, which affirmed the Referee's determination. The Board found that

> [t]he [C]laimant deliberately withheld information from the [E]mployer regarding her non-compete agreement with [MSN]. *The [C]laimant's actions threatened to engulf the [E]mployer in litigation with [MSN] and her separation was clearly her own fault. The [C]laimant had a duty to appraise [sic] the [E]m-ployer of the agreement during the hiring process.*

Board Opinion, 2 (emphasis added). The Board concluded that Claimant's violation of this duty constituted willful misconduct and, thus, barred her eligibility for unemployment compensation. Claimant then petitioned for this Court's review.[6]

The sole issue on appeal is whether Claimant's failure to inform Employer of the Agreement at the time of her interview and hire constituted willful misconduct. Claimant contends that the record does not support the Board's finding that Claimant deliberately withheld information from Employer because Employer never asked whether she had signed an agreement not to compete. Further, Claimant contends that there is no duty upon a job applicant to volunteer the existence of such an agreement. We agree.

 An employer bears the burden of proving that an employee engaged in willful misconduct. For behavior to constitute willful misconduct, the employee's behavior must evidence (1) the wanton and willful disregard of the employer's interest; (2)

---

5. Claimant is critical of the Referee's handling of the hearing, and the Board argues at some length that Claimant's hearing comported with due process. To that end, it directs our attention to its regulation at 34 Pa.Code § 101.21(a), which addresses the duties of a referee where claimants appear *pro se.* The regulation obligates a referee to inform claimant of a right to counsel and then to

> aid [claimant] in examining and cross-examining witnesses, and give [claimant] every assistance compatible with the impartial discharge of its official duties.

The Referee's conduct falls short of this standard.

The Referee interrupted Claimant; chastised her for not reading (and remembering) the terms of the Agreement; quarreled with Claimant's description of the Agreement as "not legal" when "not enforceable" was more precise; and, *sua sponte,* objected to Claim-

ant's attempted testimony about Employer's treatment of other employees allowed to work in spite of having agreed to a non-compete on grounds of hearsay. First, hearsay is admissible in administrative hearings. Second, there are numerous exceptions to the hearsay rule, such as admissions, that make such statements admissible even in a judicial proceeding. At the same time, the Referee permitted Employer's witness to testify to the outcome of his discussion with MSN.

6. Our scope of review is limited to determining to determining whether the findings of facts are supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Arnold v. Unemployment Board of Review,* 703 A.2d 582 (Pa. Cmwlth.1997).

the deliberate violation of work rules; (3) the disregard of standards of behavior which an employer can rightfully expect from his employee; or (4) negligence which manifests culpability or wrongful disregard of the employer's interests, or obligations. *Grieb v. Unemployment Compensation Board of Review*, 573 Pa. 594, 598–600, 827 A.2d 422, 425 (2003). An employee's negligence constitutes willful misconduct only where "it is of 'such a degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.'" *Id.* at 600, 827 A.2d at 425–426. Whether an employee's actions constitute willful misconduct is a question of law subject to plenary review by this Court. *Nolan v. Unemployment Compensation Board of Review*, 57 Pa.Cmwlth. 186, 425 A.2d 1203 (1981).

Here, the Board articulated Claimant's willful misconduct as deliberate withholding of information. It is not clear how this standard relates to the four willful miscon-

duct criteria. Whether the Board's standard is a new criterion or a modification to an existing one, however, does not matter. The record does not support the Board's finding that Claimant deliberately withheld information from Employer.[7]

Claimant testified that she forgot about the Agreement. T.T. 10. Certainly, forgetfulness does not equate with deliberate withholding of information. The Referee did not make an express credibility determination on this statement of Claimant, and neither did the Board. Notably, Claimant's statement is supported by her conduct. She gave MSN as a reference, which she would not have done had she been trying to conceal the existence of the Agreement. Further, Claimant did not have a copy of the Agreement, which was in her possession for less than one day. The Agreement, a model of prolixity, does not lend itself to comprehension let alone memorization. In short, the record does not support a finding of a deliberate action by Claimant because Employer presented no evidence on this point.[8] To the con-

---

7. The Employer policy is attached to the document entitled "Receipt and Acknowledgment of Andventure Employee Manual." Employer alleged that Claimant violated Item Number 11, which provides,

> Dishonesty; falsification or misrepresentation on your application for employment or other work records; lying about sick or personal leave; falsifying reason for a leave of absence or other date requested by Andventure; alteration of Andventure records or other Andventure documents.

In the course of the appeal, Employer dropped its claim that Claimant was dishonest on her application.

Indeed, the record does not support this claim of Employer. First, Claimant responded "yes" to the question of whether she had been terminated or asked to resign from her former position. Second, she gave as her reason for leaving MSN "resigned/personal." Reading the two questions and answers leads to one conclusion: Claimant was asked to resign for personal reasons.

The Employer also claimed that Claimant failed to identify the "disability" of the non-compete on a supplemental ADA questionnaire. First, it is clear that the question concerned a physical disability. Second, the Agreement was unenforceable and, thus, did not legally disable her. In any case, before this Court the Board has not advanced Employer's claim that she violated the Employee Manual, and Employer has not participated in this appeal.

8. In fact, the record demonstrates that Claimant was forthcoming with Employer in many respects. When she received the threatening letter from MSN, she immediately informed Employer and took steps to obtain a copy of the Agreement. Employer's representative, Anderson, responded to this information with the comment "usually [non-compete agreements] are not even enforceable. I wouldn't worry about it." T.T. 12.

trary, Employer's own letter to the UC Center described Claimant's failure to volunteer the Agreement as neglect.

The Board's conclusion that Claimant "threatened to engulf the employer in litigation" is flawed on several grounds. Claimant, not MSN, was in harm's way, assuming the Agreement was a valid one. Such a premise however, is not supportable here.

■ The Agreement is a classic contract of adhesion: it is a standardized contract form offered on a take it or leave it basis and not freely negotiated. *Todd Heller, Inc. v. United Parcel Service, Inc.,* 754 A.2d 689, 699 (Pa.Super.2000). As noted by Judge Aldisert,

> [c]ontract formation under such circumstances is an experience "not ... of haggle or cooperative process, but rather of a fly and flypaper."... The *dominant party ... employs the practices of minute print, unintelligible legalese ...* The dominant party realizes that the weaker party's assent is not genuine.

*Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co.,* 610 F.2d 1174, 1179–1180 (3d Cir.1979) (emphasis added) (wherein the court was considering Pennsylvania law). Adhesion contracts run the spectrum. At one end is the overreaching and one-sided adhesion contract that is unconscionable and unenforceable, and at the other end is the insurance policy,[9] which is a standardized, enforceable agreement although subject to construction against the drafter. *Allstate Ins. Co. v. Fodor,* 49 Pa. D. & C. 4th 541 (2000).[10]

The Agreement is a form contract that MSN did not bother to complete;[11] its terms are expressed in unintelligible legalese; and they are set forth in minute print. It purports, for example, to obligate the employee to keep confidential all information "MSN *desires* to protect and keep confidential," such as "ideas,"[12] and this includes all "MSN's affiliates and subsidiaries," wherever located. It allows MSN to enforce this obligation in any court of any state, and the employee consents to a transfer to any court of competent jurisdiction. C.R. 19. Stated otherwise, MSN could pursue Claimant in Arizona for sharing an "idea" that MSN "desired" to keep confidential, and then, after a sale of the assets to a European company, MSN's successor could transfer the case to the International Court of Justice at The Hague. This is one-sided, and it is over-reaching. The Agreement was presented to Claimant more as an ultimatum[13] than a matter to be negotiat-

---

9. All insurance policies are, however, subject to prior review and approval by the Pennsylvania Insurance Department. Section 354 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended,* as added by the Act of June 23, 1931, P.L. 904, 40 P.S. § 477b. The review prevents, it is hoped, from using one-sided, overreaching and unreasonable agreements.

10. *See also, Rudolph v. Pennsylvania Blue Shield,* 553 Pa. 9, 17, 717 A.2d 508, 512 (1998) (Nigro, J. concurring).

11. It leaves blank, for example, such critical items as governing law and jurisdiction for enforcement even though some of the employee obligations are nationwide in scope.

12. Paragraph 3 of the Agreement provides helpful examples of "confidential information" such as "ideas," "discoveries," and "improvements." To be sure, it also identifies "client lists," which is more concrete. However, as noted by Claimant, the medical providers used by agencies such as MSN and Employer do not sign exclusive agreements but, rather, enroll with a number of agencies. The same is true with respect to their clients. C.R. 13.

13. *Brokers Title,* 610 F.2d at 1179 (wherein it was noted that an adhesion contract "is dictated by a predominant party to cover transactions with many people rather than with an individual, and which resembles an ultima-

ed; indeed, Claimant's continued employment was at stake. There is little question about the Agreement's placement on the spectrum of adhesion contracts.

The restrictive covenant that formed the basis of the Board's decision was the non-compete covenant.[14] Recently, our Supreme Court held that a non-compete contract that had been assigned in an asset sale without the employee's agreement to the assignment[15] was not enforceable. *Hess v. Gebhard & Co., Inc.*, 570 Pa. 148, 808 A.2d 912 (2002). In her opinion, Justice Newman provides the history of non-compete agreements, which were initially *per se* void and unenforceable, but subsequently were upheld so long as the restraints were not too general. By contrast,

> partial restraints that operated within a small, defined geographic area were enforceable if the consideration were sufficient to show that the agreement was reasonable. Thus, the balancing test was born; it has been applied for centuries and is still employed by courts today.

*Id.* at 158, 808 A.2d at 917 (citations omitted). In Pennsylvania, this balancing requires that "a legitimate interest of the employer to be protected *as a condition precedent* to the validity of a covenant not to compete." *Id.* at 163, 808 A.2d at 920 (emphasis added). Further, there is a "policy of strict interpretation of restric-

tive covenants in employment contracts." *Id.* at 166, 808 A.2d at 922.

Here, the Agreement is not supported by sufficient, or any, consideration. Claimant was never paid the $10 recited in the Agreement, and she was not assured employment even for a short term. Indeed, the Agreement required Claimant to acknowledge that she was an employee at will, leaving MSN free to discharge her, for any reason or no reason, the day after she signed.

The scope of restraint established by the Agreement is not "partial," but, rather, general. It disables her from doing "*any work* competitive with MSN Business within a sixty (60) mile radius of any MSN to which [Claimant was] principally assigned within the two (2) years prior to termination." (Emphasis added). C.R. at 17. It bars her from owning a single share of stock in a privately held corporation that competes with MSN.

The Agreement does not meet the condition precedent identified in *Hess* that the employer have a legitimate and protectable interest at stake. That interest is expressed as "MSN Business," a term undefined and capable of many interpretations. Claimant has one-year of post-high school education; since completing her education, she has been employed in a variety of clerical and administrative positions, principally in doctor's offices. There is no

tum of law rather than a mutually negotiated contract.") (citation omitted).

**14.** Claimant was discharged by MSN for "poor performance," which Claimant did not accept and, therefore, refused to resign. However, by dismissing Claimant on this ground, MSN defeated its ability to enforce the non-compete. *Insulation Corp. of America v. Brobston*, 446 Pa.Super. 520, 667 A.2d 729 (1995) (wherein it was held that an employee discharged on performance grounds is deemed not able to advance, or hurt, a legiti-

mate employer interest and, therefore, the non-compete is unenforceable).

**15.** The Agreement, not surprisingly in light of its one-sidedness, allows MSN to assign Claimant's obligations to another party without any notice to her. Claimant, however, agrees not to assign her obligation to another without MSN's consent. How Claimant could transfer her obligation not to reveal company secrets or not to compete is a mystery. C.R. 19.

legitimate business interest served by preventing a clerical employee from doing the same type of work for a competitor.

The Agreement, in short, cannot withstand the threshold requirements for a valid non-compete covenant. Its terms are too one-sided and flawed to be enforceable.[16] As noted in *Hess,*

> restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

570 Pa. at 157, 808 A.2d at 917. That is precisely the effect in this case. The non-compete covenant impedes Claimant's ability to earn a living, and it restrains trade in an unseemly manner. Claimant does not hold the formula for Coca–Cola; she does office work.[17]

We return, then, to the matter of Claimant's alleged duty to volunteer the existence of the Agreement. The Board found that Claimant's actions threatened to "engulf" Employer in litigation. The litigation threat against Claimant was unfounded, as her attorney advised, and Employer escaped litigation by firing Claimant, as suggested to it by MSN.[18] The real question not addressed by the Board, is how Claimant, an individual not trained in the law, could possibly expect that Employer, who was not a party to the Agreement, could be named in a lawsuit initiated to enforce Claimant's contractual obligation.

If mere threat of litigation, even meritless litigation, is to be the standard for placing a duty on job applicants to volunteer information, it will be a standard shrouded in fog.[19] It will mean that applicants will have to advise prospective employers of a myriad of personal problems that have the potential to "engulf" the employer. It will leave job applicants guessing at what information might be relevant to a prospective employer. Standards for the award of unemployment compensation benefits, however, must be

---

**16.** A tacit recognition of this point is seen in the express reformation clause. In fact, non-compete provisions are frequently reformed as a matter of equity. If the Agreement had not been unconscionable in form, it would likely be reformed as to the time (2 years) and geographic (60 miles) limits.

**17.** It may be appropriate, in some circumstances, to require office workers to keep propriety information confidential after their separation from employment. However, that is not the issue here. In any case, because the Agreement is unenforceable by reason, among others, of the lack of consideration, Claimant is under no such duty.

**18.** To the extent that MSN would have a cause of action against Employer, which was not a party to the Agreement, it would be for intentional interference with contractual relations. "In this Commonwealth, '[o]ne who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.'" *Judge Technical Services, Inc. v. Clancy,* 813 A.2d 879, 887 (Pa.Super.2002) (citations omitted). Employer could not be held liable under this test. Since Employer had no knowledge of the Agreement, and it could not induce Claimant to breach an agreement that it knew nothing about.

MSN sent a letter to Employer, in which it requested Claimant's termination by December 24, 2001. It also advised that if Employer was "aware" of the Agreement when it hired Claimant, then it could become a party to litigation, should suit be filed. In short, MSN understood that its right to "engulf" Employer in its action against Claimant was limited.

**19.** The standard proposed by the dissent, *i.e.,* requiring a job applicant to volunteer any information that might preclude "claimant from performing [that] job" is as open-ended as the Board's standard.

objective and clear in order to avoid *ad hoc* determinations.

■ The Board erred. The employer, not the applicant, should bear the duty of identifying issues that are directly material to the decision to hire. To the extent an employer has a concern, it may simply ask whether an applicant has entered into any restrictive covenants and then make its own evaluation of whether the covenants are material, relevant or enforceable. We hold that Employer did not meet its burden of demonstrating that Claimant's separation from employment was the result of Claimant's willful misconduct. Claimant did not have a duty to volunteer the existence of the Agreement during her interview by Employer, and we decline to establish, for the first time, that any applicant for a job has such a duty.[20]

For the above reasons, we reverse the order of the Board.

## ORDER

AND NOW, this 26th day of November, 2003, the order of the Unemployment Compensation Board of Review dated June 14, 2002 in the above-captioned matter is hereby reversed.

---

**20.** This does not excuse an applicant from responding truthfully to material, factual questions on a job application. Deliberate violation of a work rule or policy has long been found to be "willful misconduct." *Altemus v. Unemployment Compensation Board of Review*, 681 A.2d 866 (Pa.Cmwlth.1996).

**1.** Act of December 5, 1936, Second Ex.Sess., P.L. (1937), *as amended*, 43 P.S. § 802(e). That section provides in relevant part:
 An employee shall be ineligible for compensation for any week—
 (e) in which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not

## DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority's holding that Sandra Zimmerman (Claimant) is entitled to unemployment compensation benefits even though she failed to disclose to Nursefinders (Employer) at the time she was interviewed for the position that she had executed a non-compete agreement because that failure did not rise to the level of willful misconduct under Section 402(e) of the Pennsylvania Unemployment Law (Law).[1] While I recognize the majority's antipathy to restrictive covenants, the majority is looking at these covenants as an aggressive attorney would look at them, not as an employer who has to pay the fees of aggressive attorneys.

Claimant began her employment with Employer on December 3, 2001, as a client coordinator. Prior to that employment, Claimant had been employed by Medical Staffing Network (MSN) from October 25, 2000 until October 2, 2001. While at MSN, however, Claimant signed a non-compete agreement which stipulated that after leaving MSN, she would not work for a competitor for one year or within a 60–mile radius of any MSN office.[2] Claimant did not advise Employer of the non-compete agreement during the interview or

---

such work is "employment" as defined in this act . . .
Under Section 402(e) of the Law, 43 P.S. § 802(e), an employee is ineligible for unemployment compensation benefits when his unemployment is due to a discharge from work for willful misconduct that is connected to his job, and the employer bears the burden of proving willful misconduct in an unemployment case. *Myers v. Unemployment Compensation Board of Review*, 533 Pa. 373, 625 A.2d 622 (1993).

**2.** Employer's facility is located approximately 41 miles from an MSN office.

hiring process. After hiring Claimant for the client coordinator position, Employer received a letter from MSN's counsel advising it of the non-compete agreement signed by Claimant. As a result, Employer discharged Claimant on December 19, 2001, for her dishonesty in violation of its policy.

Following her termination, Claimant sought and was granted unemployment benefits by the Office of Employment Security; however, on appeal, the Referee denied those benefits. Claimant then appealed that determination, which the Unemployment Compensation Board of Review (Board) affirmed, finding that Claimant deliberately withheld information from Employer regarding the non-compete agreement, and that her failure to disclose that information constituted willful misconduct pursuant to Section 402(e) of the Law.

On appeal, the majority reverses the Board's decision, concluding that there was no affirmative duty on the part of Claimant to inform Employer of the non-compete clause during the hiring process. In doing so, the majority focuses on the Pennsylvania courts' disfavor of non-compete agreements.

Whether non-compete agreements are disfavored by the courts of Pennsylvania is irrelevant, and it also does not matter whether Claimant and, potentially, Employer would have been successful in a lawsuit brought by MSN to enforce the non-compete agreement. All that matters is that such an agreement existed, and that by hiring Claimant, Employer was made vulnerable to a lawsuit. In *Navickas v. Unemployment Compensation Review Board,* 567 Pa. 298, 304, 787 A.2d 284, 288 (2001), our Supreme Court has stated that employers' interests and expectations have to be taken into consideration in determining whether there is willful misconduct, defining the standard as follows:

> Willful misconduct is not defined in the unemployment compensation statutes; however, this Court has defined willful misconduct in the context of unemployment compensation as: a) wanton or willful disregard for an employer's interests; b) deliberate violation of an employer's rules; c) disregard for standards of behavior which an employer can rightfully expect of an employee; or d) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations.... It is notable that the standard we have articulated makes reference to the **employer's interests, rules, and expectations,** and also emphasizes the totality of the circumstances. Implicit in this necessarily flexible approach to determining what constitutes willful misconduct on the part of an individual employee is a recognition of the myriad working conditions and work rules that apply throughout the Commonwealth. Thus, the conduct that rises to the level of willful misconduct may vary depending upon an individual employee's specific occupation or work situation. (Emphasis added.)

Due to the potential consequences to an employer of hiring an individual who is subject to a non-compete agreement, it is against the employer's interests and expectations for a potential employee not to disclose the non-compete agreement. Whether a potential employee is restricted by a non-compete agreement goes directly to whether that person is employable for certain positions by certain employers, making it incumbent upon him or her to notify the potential employer of the existence of the non-compete agreement. An omission of such a vital aspect of his or her employability can be equated to the prospective employee providing an untruthful

response to a direct question posed by the employer.

In addition to its antipathy to restrictive covenants, the majority also finds that Claimant was not guilty of willful misconduct because she merely "forgot" that she had signed a non-compete agreement. In making that finding, the majority impermissibly disregards that the Board found that "[C]laimant deliberately withheld information from [E]mployer regarding her non-compete agreement with her prior employer." Once Employer established that a non-compete agreement existed, the burden shifted to Claimant to establish that she "forgot." While she testified that she forgot, the Board did not find her testimony credible and found that she remembered what she had signed and that disregarded Employer's interests and expectations.

Not only does the majority ignore Employer's expectations and interests in finding that Claimant did not commit willful misconduct and the Boards finding that she did so deliberately, it now establishes a standard that makes it incumbent on an employer to ferret out every piece of information that precludes a claimant from performing the job that the claimant is hired to perform. Under the majority reasoning, a claimant would receive unemployment benefits if he or she applies for a job as driver but does not have a license if employer makes the reasonable assumption that the person applying knows that a driver's license is necessary and hires that person. Whether a claimant receives unemployment compensation should not depend on a "gotcha" standard.

In this case, Employer hired Claimant in good faith and then a mere two weeks later was threatened with legal action if it did not immediately terminate her employment based on the non-compete agreement Claimant executed with her previous employer that she deliberately withheld from Employer. Because that conduct is not in accord with Employer's interests and expectations, I would affirm the decision of the Board.

Accordingly, I respectfully dissent.

Judges LEADBETTER and COHN join.