NO. COA14-623

NORTH CAROLINA COURT OF APPEALS

Filed: 31 December 2014

TSG FINISHING, LLC,

    Plaintiff,

    v.                                    Catawba County
                                         No. 14 CVS 104

KEITH BOLLINGER,

    Defendant.


Appeal by plaintiff from order entered 20 February 2014 by Judge Calvin E. Murphy in Catawba County Superior Court. Heard in the Court of Appeals 3 November 2014.

> *Law Offices of Matthew K. Rogers, PLLC, by Matthew K. Rogers, for plaintiff-appellant.*
>
> *Patrick, Harper & Dixon, LLP, by Michael P. Thomas, for defendant-appellee.*


HUNTER, Robert C., Judge.


TSG Finishing, LLC ("plaintiff" or "TSG") appeals from an order denying its motion for a preliminary injunction aimed at preventing its former employee, Keith Bollinger ("defendant"), from breaching a non-competition and confidentiality agreement ("the non-compete agreement") and misappropriating TSG's trade secrets. On appeal, plaintiff contends that the trial court erred by denying its motion for a preliminary injunction

because: (1) it has demonstrated a likelihood of success on the merits of its claims for breach of contract and misappropriation of trade secrets; and (2) it would suffer irreparable harm without issuance of the preliminary injunction.

After careful review, we reverse the trial court's order and remand with instructions to issue the preliminary injunction.

## Background

TSG is in the business of fabric finishing. It has three plants in Catawba County, North Carolina. Rather than manufacturing fabrics, TSG applies chemical coatings to achieve whichever result is desired by the customer, such as coloring, stiffening, deodorizing, and abrasion resistance.

Defendant began working in the field of fabric finishing for Geltman Corporation after graduating from high school in 1982. He has no formal education beyond high school. TSG, Incorporated ("TSG, Inc.")[1] acquired Geltman in 1992, and defendant stayed on to work for TSG, Inc. By the late 1990's, defendant was promoted to Quality Control Manager.

Defendant was responsible for assessing a customer's finishing needs and developing a finishing protocol for that

---

[1] As will be discussed below, plaintiff is a wholly owned subsidiary of TSG, Inc.

customer.  Defendant also helped in the creation of a "style data card" for each customer.  The style data cards contained information on each step of the finishing process, such as: (1) the chemical finish compound, 70 percent of which was proprietary to TSG; (2) "cup weight" density; (3) needle punch technique; (4) type of machine needed for the needle punch technique; (5) speed of needle punch; (6) types of needles used; (7) needle punch depths; (8) method of compound application; (9) speed of compound application; (10) blade size; (11) fabric tension; and (12) temperature and type of drying required.

Defendant testified during deposition that some of these factors required trial and error to achieve a customer's desired result.  For example, on one of the style data cards used to explain defendant's work-related duties during the deposition, defendant had marked a number of changes to the various factors listed and signed his initials to the changes.  He testified that he changed the data entered by the customer because subsequent testing revealed different and more efficient methods to achieve the result.  He also testified that the results of the trials he conducted and the knowledge he gained regarding how to achieve these results were not known outside of TSG. Michael Goldman, the Director of Operations at TSG, filed an

affidavit in which he asserted that some of the customer projects that defendant worked on required over a year's worth of trial and error to achieve a customer's desired result.

TSG expends great effort to keep its customer and finishing information confidential. Specifically, it uses a code system in its communications with customers that allows the customer to identify the type of finish it wants, but does not reveal the chemicals or processes involved in creating that finish. TSG has confidentiality agreements in place with many of its customers. Third parties must sign confidentiality agreements and receive a temporary identification badge when visiting TSG's facilities. TSG's computers are password protected, with additional passwords being required to access the company's production information.

In 2007, TSG, Inc. and defendant entered into a non-disclosure and non-compete agreement. In exchange for an annual increase in compensation of $1,300.00 and a $3,500.00 signing bonus, defendant agreed not to disclose TSG, Inc.'s confidential or proprietary trade secrets and further assented to employment restrictions after his tenure at the company ended.

TSG, Inc. filed for bankruptcy in 2009. By a plan approved by the United States Bankruptcy Court on 1 May 2011, TSG, Inc.

transferred its interests to plaintiff, a wholly owned operating subsidy of TSG, Inc., which remained in operation. According to defendant, every aspect of his day-to-day job remained the same after bankruptcy reorganization.

In July 2013, defendant and a direct competitor of TSG, American Custom Finishing, LLC ("ACF"), began negotiations regarding defendant's potential to leave TSG and work for ACF. According to TSG, defendant resigned from his position on 21 November 2013 and announced that he was leaving to become plant manager for ACF at a plant five miles away from TSG. Defendant claims that he gave TSG two weeks' notice on 21 November 2013 but was terminated immediately and escorted off of the premises. Defendant began working for ACF the following Monday, on 25 November 2013. During his deposition, defendant testified that TSG and ACF shared certain customers, and that defendant is responsible for performing similar customer evaluations for ACF as he did at TSG.

TSG filed suit against defendant on 16 January 2014, alleging claims for breach of contract, misappropriation of trade secrets, and unfair and deceptive practices. TSG also moved for a preliminary injunction to prevent defendant from breaching the non-compete and misappropriating TSG's trade

secrets. A confidential hearing was held on plaintiff's motion, and by order entered 20 February 2014, the trial court denied the motion for preliminary injunction. Plaintiff filed timely notice of appeal.

## Grounds for Appellate Review

We must first address the interlocutory nature of plaintiff's appeal. Orders granting or denying preliminary injunctions are "interlocutory and thus generally not immediately reviewable. An appeal may be proper, however, in cases, including those involving trade secrets and non-compete agreements, where the denial of the injunction deprives the appellant of a substantial right which he would lose absent review prior to final determination." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 507, 606 S.E.2d 359, 361 (2004) (citations and internal quotation marks omitted).

> [W]here time is of the essence, the appellate process is not the procedural mechanism best suited for resolving the dispute. The parties would be better advised to seek a final determination on the merits at the earliest possible time. Nevertheless, [where a] case presents an important question affecting the respective rights of employers and employees who choose to execute agreements involving covenants not to compete, we have determined to address the issues.

*A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983). Citing the rule in *A.E.P. Indus., Inc.*, this Court has held that "the same reasoning applies to agreements between an employer and employee regarding protection of the employer's alleged trade secrets." *Horner Intern. Co. v. McKoy*, __ N.C. App. __, __, 754 S.E.2d 852, 855 (2014). Accordingly, because both a non-compete and the potential misappropriation of trade secrets are implicated by this case, we conclude that plaintiff has succeeded in demonstrating how a substantial right may be lost without immediate appellate review; thus, we will reach the merits of the appeal.

**Discussion**

**I. Misappropriation of Trade Secrets**

Plaintiff first argues that the trial court erred by concluding that it has not demonstrated a likelihood of success on the merits of its claim for trade secret misappropriation. After careful review, we agree.

> As a general rule, a preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation. It will be issued only (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the

> protection of a plaintiff's rights during the course of litigation.

*A.E.P. Indus., Inc.*, 308 N.C. at 401, 302 S.E.2d at 759-60 (citations and internal quotation marks omitted). The standard of review from a denial of a preliminary injunction is "essentially *de novo*," *VisionAIR, Inc.*, 167 N.C. App. at 507, 606 S.E.2d at 362, wherein this Court is not bound by the factual findings of the trial court, but may review and weigh the evidence and find facts for itself, *A.E.P. Indus., Inc.*, 308 N.C. at 402, 302 S.E.2d at 760. "Nevertheless[,] a trial court's ruling on a motion for preliminary injunction is presumed to be correct, and the party challenging the ruling bears the burden of showing it was erroneous." *VisionAIR, Inc.*, 167 N.C. App. at 507, 606 S.E.2d at 362.

The Trade Secrets Protection Act ("TSPA") allows for a private cause of action where a plaintiff can prove the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. §§ 66-152(1), -153 (2013).

"Trade secret" means business or technical

information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3) (2013). To determine what information should be treated as a trade secret for the purposes of protection under the TSPA, the Court should consider the following factors:

(1) the extent to which the information is known outside the business;

(2) the extent to which it is known to employees and others involved in the business;

(3) the extent of measures taken to guard secrecy of the information;

(4) the value of the information to business and its competitors;

(5) the amount of effort or money expended in developing the information; and

(6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003).

"[A]ctual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation[.]" N.C. Gen. Stat. § 66-154(a) (2013).

> Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both:
>
> (1) Knows or should have known of the trade secret; and
>
> (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

N.C. Gen. Stat. § 66-155 (2013).

Here, the trial court determined that plaintiff failed to demonstrate likelihood of success on the merits of its misappropriation of trade secrets claim for the following reasons: (1) plaintiff asserted that its finishing process "as a whole" was the trade secret for which it sought protection, and under the holding of *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003), general processes are too vague to receive TSPA protection; and (2) defendant's

familiarity with customer preferences was "more akin to general knowledge and skill acquired on the job than any trade secret maintained by [p]laintiff." For the following reasons, we disagree with the trial court's conclusions.

First, contrary to the trial court's assessment of the preliminary injunction hearing, plaintiff did not "continually assert" that it was the "combination of [the] components," or the "process as a whole," for which it sought protection. Although TSG's Chief Executive Officer Jack Rosenstein ("Rosenstein") did say that the entire equation of processes was a trade secret in and of itself, he also testified that the particular steps in the process were also trade secrets. As an example, Rosenstein highlighted the needle punch technique on a style data card that defendant had worked on during his time at TSG. The customer initially requested that the fabric be put through the needle punch machine one time at a specific setting. Through trial and error, defendant discovered that the customer's desired result could not be accomplished by running the needle punch machine one time at this setting, so he changed the process after experimenting with varying settings. Rosenstein testified the needle punch research for this client, in addition to the similar types of experimentation done to

various processes throughout the finish equation, were trade secrets. Specifically, he testified as follows:

> [ROSENSTEIN]: That's all part of the trade secrets. That's all part of what [defendant], in his own mind when he's looking at a new fabric, needs to determine – which Latex should be used, what density needs to be used, whether it needs to be needle punched or not and then within that which – which needle punch, what depth of penetration – exactly what the parameters are. Then he needs to determine what range it needs to go on, what speed needs to be run, what the finish is. . . .

> Q: And so each one of those variables impacts the other variables in the equation?

> [ROSENSTEIN]: Yes.

Therefore, it was not just the process as a whole, but the specific knowledge defendant gained as to each discrete step in the process, that TSG sought to protect.

Based on *Analog Devices, Inc.*, the trial court concluded that plaintiff had failed to "put forward enough facts to support trade secret protection over the process as a whole or any particular component such that the [trial court] would be justified in granting the injunction sought." However, the *Analog Devices, Inc.* Court upheld the denial of a preliminary injunction in part because the differences between the defendant's former and new employers "render[ed] the alleged

trade secrets largely non-transferable." *Analog Devices, Inc.*, 157 N.C. App. at 467, 579 S.E.2d at 453. Furthermore, the Court determined that the plaintiff did not carry its burden of producing evidence specifically identifying the trade secrets it sought to protect. *Id.* at 469, 579 S.E.2d at 454. The evidence before the Court showed that some of the plaintiff's production techniques were "easily and readily reverse engineered," while others were "either generally known in the industry, are process dependent so as to preclude misappropriation, or are readily ascertainable by reverse engineering." *Id.* at 470, 579 S.E.2d at 454. Finally, regarding the processes used by the plaintiff, the Court found that there was substantial differences between the products of the two companies that would "require new experimentation and development of new ways to effectively identify efforts that will lead to successful development." *Id.* Thus, the Court affirmed the trial court's denial of the preliminary injunction. *Id.* at 472, 579 S.E.2d at 455.

The facts of this case are readily distinguishable from *Analog Devices, Inc.*, and they demonstrate that TSG would likely prevail on the merits of its claim for misappropriation of trade secrets. Using the factors enunciated by *Area Landscaping, L.L.C.*, 160 N.C. App. at 525, 586 S.E.2d at 511, TSG presented

sufficient evidence on its specific trade secrets to warrant protection. First, Rosenstein testified that the company spends $500,000.00 per year on research and development in order to create unique finishes and applications for his customers. Defendant testified that the results of his experimentation at TSG regarding specific process refinements were not known outside of TSG. Rosenstein also testified that defendant's work was not something that anyone else in the industry would know without years of trial and error by experienced technicians. Security measures were in place such that only top-level employees were familiar with the proprietary information defendant was in charge of developing. The trial court acknowledged in its order that TSG "maintains significant security measures over its finishing process." Indeed, TSG made its employees, customers, and facility visitors sign confidentiality forms to protect this information. Additionally, Rosenstein testified that defendant's disclosure of the trade secrets would give ACF the opportunity to save "untold amounts of hours, days, weeks, and months to come up with these finishes and these applications." Rosenstein testified that defendant could help ACF achieve their customers' desired results, which they sometimes shared with TSG, without

spending the money on research and development that TSG invested. Defendant admitted as much in his deposition when he testified that he performs many of the same duties for ACF for some of the same customers that he formerly served at TSG. Therefore, unlike in *Analog Devices, Inc.*, there was significant evidence showing that TSG's trade secrets were transferrable to ACF. Over the past two decades, TSG invested millions of dollars to develop and protect the information defendant compiled through his years of employment. The director of operations at TSG testified in deposition that defendant would sometimes work for more than a year on a process in order to achieve a desired result. There is no indication in the record that these process are able to be "reverse engineered" like those in *Analog Devices, Inc.*, and it is undisputed that they are not generally known throughout the industry.

In sum, each of the factors identified by the *Area Landscaping, L.L.C.* Court weigh in plaintiff's favor. Plaintiff specifically identified the production factors for which it claims trade secret protection. Defendant acknowledged during his deposition that he performed research and development for these factors during his time at TSG and was responsible for keeping customer- and fabric-specific proprietary information

regarding these processes on the style data cards. Therefore, we conclude that plaintiff has carried its burden of presenting evidence sufficient to identify the specific trade secrets protected by the TSPA.

Additionally, we hold that plaintiff presented *prima facie* evidence of misappropriation of its trade secrets. "Direct evidence . . . is not necessary to establish a claim for misappropriation of trade secrets; rather, such a claim may be proven through circumstantial evidence." *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658, 670 S.E.2d 321, 329 (2009). Defendant testified that he is being asked to perform similar duties for ACF that he did at TSG, including evaluating customer needs and organizing production processes. Defendant acknowledged that TSG and ACF share customers and that he is currently working with multiple customers for ACF that he served at TSG. Specifically, he admitted that he had done independent research and experimentation for TSG on the needle punch, finish, and heating processes for one specific customer that he now serves at ACF, and that he talks about the various components of the TSG style data cards with ACF management personnel. This is precisely the type of threatened misappropriation, if not actual misappropriation, that the TSPA

aims to prevent through issuance of a preliminary injunction. *See* N.C. Gen. Stat. § 66-154(a) (2013) ("[A]ctual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation . . . ."); *see also Horner Intern. Co.*, __ N.C. App. at __, 754 S.E.2d at 859 ("Courts have upheld grants of a preliminary injunction where plaintiffs have presented some evidence that former employees have or necessarily will use trade secrets.").

Based on the foregoing, we conclude that plaintiff demonstrated a likelihood of success on the merits of his claim for trade secret misappropriation.

## II. Breach of Contract

Plaintiff next argues that the trial court erred by concluding that it failed to present a likelihood of success on the merits of its claim for breach of the non-compete. We agree.

Due to a choice of law provision in the agreement, Pennsylvania law governs enforcement of the non-compete. "[R]estrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living." *Hess v. Gebhard & Co.*

*Inc.*, 808 A.2d 912, 917 (Pa. 2002). However, "restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." *Id.* Thus, in assessing whether to enforce a non-compete agreement, Pennsylvania law requires the court to balance "the employer's protectable business interests against the interest of the employee in earning a living in his or her chosen profession, trade or occupation, and then balance[e] the result against the interest of the public." *Id.* at 920.

Here, the trial court rejected plaintiff's argument that the non-compete was enforceable for three reasons: (1) the agreement does not contain an explicit "assignability" clause that would allow defendant to be bound to the contract after bankruptcy reorganization, wherein all of the company's assets and contracts were transferred from TSG, Inc. to its subsidiaries; (2) even if there were an assignability clause, there is no indication in the record that the non-compete was actually assigned from TSG, Inc. to plaintiff; and (3) even if the court concluded that there was an effective assignment, the

balancing of the equities would require the trial court to find the non-compete unenforceable.

First, defendant relies on *Hess* for the proposition that an explicit assignability clause was necessary for plaintiff to enforce the non-compete. In *Hess*, the Pennsylvania Supreme Court determined that employment contracts are "personal to the performance of both the employer and the employee." *Hess*, 808 A.2d at 922. Thus, if an employer with a valid non-compete in an employment contract is later acquired by a separate entity, it does not necessarily follow that "the employee would be willing to suffer a restraint on his employment for the benefit of a stranger to the original undertaking." *Id.* Thus, the *Hess* Court held that "a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets." *Id.*

The situation in this case is not one where plaintiff was a "stranger to the original undertaking." Unlike the sale of assets between two companies at arms' length, like the transaction that took place in *Hess*, the assignment in this case took place in the context of a bankruptcy reorganization, where

the same company policies and management were retained. Plaintiff is a wholly owned subsidiary of TSG, Inc., with whom defendant entered into the non-compete. As Rosenstein testified at the hearing, "[i]t's not a new entity. . . . it's basically the same company it was." According to defendant, every aspect of his job remained unchanged after the assignment. Therefore, the facts here are more analogous to those cases where Pennsylvania courts have declined to make assignability provisions a requirement, such as with a stock sale or merger, because the contract rights are not given to a completely new entity. *See J.C. Ehrlich Co., Inc. v. Martin*, 979 A.2d 862, 865-66 (Pa. 2009) (holding that where an employee's obligations and duties did not change in any material way after a stock purchase, a non-compete agreement was enforceable by the company with whom the agreement was made without an explicit assignability clause). Accordingly, we reject the trial court's conclusion that the non-compete is unenforceable because it did not contain a specific assignability provision.

Second, we find that the trial court erred by concluding that there is insufficient evidence in the record of an assignment between TSG, Inc. and plaintiff. The Bankruptcy Court order makes implicit mention of plaintiff as an "operating

subsidiary" and of the assignability of the non-compete as an "executory contract." Specifically, the order contains the following:

> As of the Effective Date, all Executory Contracts that are not designated to be rejected by the Debtor in the Plan Supplement shall be deemed assumed. Any assumed Executory Contract to which the Debtor is a party shall be, as of the Effective Date, deemed assumed by the Reorganized Debtor and assigned to the TSG Real Estate Subsidiary or the TSG Operating Subsidiary, as the case may be. Entry of this Order shall constitute, pursuant to Section 365 of the Bankruptcy Code, approval of the assumptions and assignments described herein as of the Effective Date. The Debtor shall not be required to obtain any third party consents to affect such assignment.

At the hearing, Rosenstein specifically testified that the non-compete between TSG, Inc. and defendant was assigned to plaintiff. We conclude that Rosenstein's testimony, in addition to the Bankruptcy Court's approval of the executory contract assignments in its order, was sufficient to find that the non-compete was assigned to plaintiff in the course of the bankruptcy reorganization.

Additionally, we believe that the restrictions imposed in the non-compete are reasonable. Under Pennsylvania law, the burden is on the employee to show how a non-compete is unreasonable in order to prevent its enforcement. *John G.*

*Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1169 (Pa. 1977). The non-compete provided that upon termination, defendant would be prevented from participating in the field of "textile finishing" for two years in the prohibited territory, which was defined, in part, as all of North America. Specifically, the non-compete prevents defendant from:

> [E]ngaging, as an employee or contractor, in the performance of Textile Finishing, engaging in the manufacture of Textile Finishing machinery or equipment, including but not limited to a jobber, reseller, or dealers of used textile machinery or equipment or engaging in sales, marketing or managerial services for any individual or entity that competes with TSG directly or indirectly within the Prohibited Territory.

In contrast to unenforceable non-competes restricting "any work" competitive to the employer, *Zimmerman v. Unemployment Compensation Bd. Of Review,* 836 A.2d 1074, 1081 (2003), the non-compete here permissibly restricts defendant from engaging in the specific industrial practices that could harm the legitimate business interests TSG seeks to protect.

Furthermore, defendant has failed to carry his burden of demonstrating that the time and geographic restrictions are unreasonable and render the non-compete unenforceable. Pennsylvania courts have consistently enforced non-compete agreements restricting employment for two or more years. *See*

*John G. Bryant Co., Inc.*, 369 A.2d at 1170 (holding that a three-year restriction was reasonably necessary for the protection of the employers to strengthen customer contact after a principal sales representative stopped working for the employer). Additionally, Pennsylvania courts have established a correlation between reasonableness of a geographic restriction and the employer's verifiable market. *See Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1338 (Pa. Super. 1997). Specifically, Pennsylvania federal courts have upheld covenants restricting competition nationwide or throughout the region of North America, where appropriate. *See Quaker Chem. Corp. v. Varga*, 509 F.Supp.2d 469, 476 (E.D.Pa. 2007). TSG presented evidence that it serves customers throughout at least 38 states, in addition to Canada and Mexico. Defendant claims that TSG failed to explain how the geographic restrictions are reasonable, and also argues that the cases TSG cites in support of the time restriction are inapposite. However, the burden is not on TSG to establish that the restrictions in the non-compete are reasonable; rather, the burden rests with defendant to show that they are unreasonable and that the contract he signed is unenforceable. *See John G.*

*Bryant Co., Inc.*, 369 A.2d at 1169. Defendant has failed to carry that burden here.

Finally, we turn to the trial court's determination that the equities weighed against enforcing the non-compete. "Fundamental . . . to any enforcement determination is the threshold assessment that there is a legitimate interest of the employer to be protected as a condition precedent to the validity of a covenant not to compete." *Hess*, 808 A.2d at 920. "Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills." *Id.* "[T]he issue of enforceability is one to be determined on a case-by-case basis," *Missett v. Hub Intern. Pennsylvania, LLC*, 6 A.3d 530, 539 (Pa. Super. 2010), wherein the Court is to consider all relevant facts and circumstances, *Insulation Corp. of America v. Brobston*, 667 A.2d 729, 734 (Pa. Super. 1995) (also noting that "[a] restrictive covenant found to be reasonable in one case may be unreasonable in others").

Among the important factors that Pennsylvania courts consider in assessing the enforceability of a non-compete are: (1) the circumstance under which the employment relationship was terminated; (2) the employee's skills and capacity; (3) the

length of time of the previous employment; (4) the type of consideration paid to the employee; (5) the effect of restraint on the employee's life; and (6) circumstantial economic conditions. *See Brobston*, 667 A.2d at 737.

> It bears noting that there is a significant factual distinction between the hardship imposed by the enforcement of a restrictive covenant on an employee who voluntarily leaves his employer and that imposed upon an employee who is terminated for failing to do his job. The salesman discharged for poor sales performance cannot reasonably be perceived to pose the same competitive threat to his employer's business interests as the salesman whose performance is not questioned, but who voluntarily resigns to join another business in direct competition with the employer. . . . [O]nly when the novice has developed a certain expertise, which could possibly injure the employer if unleashed competitively, will the employer begin to think in terms of a restrictive covenant[.]

*Id.* at 735-36 (citation and quotation marks omitted).

Based on the record before us, we believe that these notions weigh in favor of enforcement of the non-compete. Defendant worked at TSG for 27 years and became one of its most trusted and skilled managers. Throughout his tenure he developed valuable expertise in the field of textile finishing through trial-and-error and industrial experimentation that was highly guarded by TSG and not known throughout the industry. In

exchange for his assent to the non-compete, defendant was offered an annual increase of $1,300.00 to his regular salary and a signing bonus of $3,500.00; defendant considered TSG's offer for at least two weeks before eventually agreeing to the non-compete and accepting this increase in compensation. Rather than being terminated for poor work, defendant was specifically recruited and voluntarily left TSG to work for a direct competitor at a plant five miles away without giving prior notice or asking for a raise from TSG. ACF did not require defendant to provide a resume or interview for the position; defendant was hired after meeting with an ACF representative one time. Given that defendant possessed advanced expertise in the field of textile finishing and abruptly and voluntarily left his position at TSG after 27 years of service to work for a direct competitor, we find that he poses a significant competitive threat to TSG's legitimate business interests should the non-compete be unenforceable.

Despite these factors, defendant argues, and the trial court agreed, that enforcement of the non-compete essentially renders him unemployable for two years because he has "no experience outside of textile finishing, rudimentary computer skills, and no college education." We are unpersuaded.

Defendant argued in his brief that ACF hired him for "his management skills in dealing with employees, human resources issues, equipment dealers, customer complaints and suppliers, not for any trade secrets or other confidential information which he might know from his time at TSG[.]" Skill in management and human resources is desirable in many fields, not just textile finishing. Although the non-compete does restrict defendant from working as an employee for any company that competes with TSG "in sales, marketing or managerial services," TSG's competitors only comprise a small subset of companies and industries where such skills are valuable. Defendant admitted that before leaving TSG for ACF, he did not look for other employment. TSG presented evidence of multiple job openings within 25 miles of Hickory, N.C., that were not competitive to TSG and listed experience in plant management and manufacturing as desirable traits. Therefore, we disagree with the trial court's conclusion that enforcement of the non-compete would effectively prevent defendant from attaining employment anywhere in North America.

We also find TSG's policy arguments in this case persuasive. TSG employs around 160 people. According to Rosenstein, the customers that defendant now serves at ACF could

account for up to forty percent of TSG's business, and some of the customer relationships that TSG has had for many years are now "strained" due to defendant's transition from TSG to ACF. In weighing the equities, we are permitted to consider the effect that breach of a non-compete may have on an employer's protectable business interests. *Hess*, 808 A.2d at 920. Among these, we consider the potential harm done to other TSG employees should defendant be permitted to retain employment at ACF in contravention of the non-compete. The significant risk that defendant's actions pose to TSG's competitive advantage indirectly threaten the job security of many others who work for TSG. Thus, in balance, we find that the equities favor enforcement of the non-compete.

In sum, we hold that the non-compete was validly assigned to plaintiff through bankruptcy reorganization, the non-compete itself is reasonable to protect TSG's legitimate business interests, and the equities weigh in favor of enforcement under these facts. Therefore, because it is undisputed that defendant is in breach of the non-compete by working for ACF, a direct competitor of TSG, we hold that TSG has demonstrated a likelihood of success on the merits of its claim for breach of contract.

## III. Irreparable Loss

Having set out that TSG has demonstrated a likelihood of success on the merits of its claims, we must now turn to whether it has shown irreparable loss should the injunction fail to issue. *See A.E.P. Indus., Inc.*, 308 N.C. at 401, 302 S.E.2d at 759-60. This Court has recognized that "[i]ntimate knowledge of the business operations or personal association with customers provides an opportunity to [a] . . . former employee . . . to injure the business of the covenantee." *QSP, Inc. v. Hair*, 152 N.C. App. 174, 178, 566 S.E.2d 851, 854 (2002) (internal quotation marks omitted). Both the *QSP, Inc.* and *A.E.P. Indus., Inc.* Courts have "emphasized that this potential harm warrants injunctive relief," *Id.* Specifically, in *QSP, Inc.*, the Court held that the plaintiff company was likely to sustain irreparable loss unless a preliminary injunction was issued where the evidence showed that: (1) the defendant violated a non-compete agreement by soliciting customers for a rival company, (2) the defendant misappropriated the plaintiff company's confidential information for the rival company, and (3) the plaintiff would continue to suffer injury should the defendant not be restrained from further violating a confidentiality and non-compete agreement. *QSP, Inc.*, 152 N.C.

App. at 179, 566 S.E.2d at 854. Here, the evidence shows that: (1) defendant has the opportunity to misappropriate the confidential information and trade secrets that he developed for TSG; (2) ACF could benefit by having defendant's knowledge of TSG's trade secrets because it could produce similar products without expending resources on research and development; (3) defendant performs similar work at ACF for some of the same customers that he served at TSG; (4) Rosenstein testified that those customers could amount to as much as forty percent of TSG's business; (5) TSG had relationships with these customers for decades; and (6) TSG's relationships with these customers became "strained" once defendant left TSG to work for ACF. Like in *QSP, Inc.*, it is clear here that TSG has demonstrated that it is likely to suffer irreparable loss unless the injunction is issued, because TSG is at risk of losing its long-held customers and whatever competitive advantage it may have had in the textile finishing industry. *See also John G. Bryant Co., Inc.*, 369 A.2d at 1167 ("[A non-compete] is designed to prevent a disturbance in the relationship that has been established between [the employer] and their accounts through prior dealings. It is the possible consequences of this unwarranted

interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages.").

**Conclusion**

For the foregoing reasons, we conclude that the trial court erred by denying plaintiff's motion to issue a preliminary injunction. Plaintiff has demonstrated a likelihood of success on the merits for its claims of trade secret misappropriation and breach of contract and has shown irreparable loss absent the issuance of the preliminary injunction. Accordingly, we reverse the trial court's order and remand with instructions to issue the preliminary injunction.

REVERSED AND REMANDED.

Chief Judge McGEE and Judge BELL concur.